# IN THE COURT OF APPEALS OF TENNESSEE
## MIDDLE SECTION AT NASHVILLE

FILED

May 3, 1996

Cecil W. Crowson
Appellate Court Clerk

HAYDEN D. WILSON, JR.,     )
                                     )

     Plaintiff/Appellee,        )

                                     )   Sequatchie Circuit
                                     )   No. 6368
VS.                              )

                                   )   Appeal No.
                                   )   01-A-01-9506-CV-00235

KATHRYN ANN MOORE,     )

                                   )

     Defendant/Appellant.     )

APPEAL FROM THE CIRCUIT COURT FOR SEQUATCHIE COUNTY
AT DUNLAP, TENNESSEE

THE HONORABLE BUDDY D. PERRY, JUDGE

For the Plaintiff/Appellee:           For the Defendant/Appellant:

Stephen T. Greer                 Jacqueline E. Schulten
Dunlap, Tennessee               Chattanooga, Tennessee

## MODIFIED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves a marriage that failed in less than three years. The husband filed suit in the Circuit Court for Sequatchie County seeking a divorce and the enforcement of the parties' prenuptial agreement. The wife also requested a divorce and challenged the validity of the prenuptial agreement. Following a bench trial, the trial court declared the parties divorced pursuant to Tenn. Code Ann. § 36-4-129(b) (1991) and upheld the prenuptial agreement. Accordingly, the trial court awarded the parties their personal property and directed the husband to assume certain credit card indebtedness and to provide the wife medical insurance for up to thirty-six months. Both parties take issue with various portions of the final divorce decree on this appeal. We have determined that the trial court erred by failing to consider the husband's income earned during the marriage as marital property. Accordingly, we modify the division of marital property and the award of spousal support.

## I.

Hayden Wilson, Jr. and Kathryn M. Wilson (now Kathryn Ann Moore) first met when they were both employed by the Sequatchie County Board of Education. Mr. Wilson, who was in his mid-forties at the time, had a doctorate degree in educational psychology and guidance and was a special education instructor. Ms. Moore worked at the same school as an aide. She was eight years younger than Mr. Wilson and was a recent divorcée with custody of two minor children. They began dating shortly after Mr. Wilson's divorce in February 1990.

Mr. Wilson proposed to Ms. Moore in March 1991. Two months later, Ms. Moore received her undergraduate degree and was employed at a local pharmacy. Mr. Wilson requested Ms. Moore to sign a prenuptial agreement because he desired to preserve his separate assets for his children. Ms. Moore was generally ambivalent about signing the agreement. On the only occasion she questioned the need for the agreement, Mr. Wilson informed her that he would not pay her to marry him. Thereafter, Mr. Wilson requested the lawyer who had represented Ms. Moore in her divorce from her first husband to prepare the agreement. They

signed the agreement on July 18, 1991 and were married ten days later on July 28, 1991. Ms. Moore and her two children moved in with Mr. Wilson and his two minor children.[1]

Ms. Moore suffered a work-related injury and stopped working at the pharmacy shortly after the wedding. The parties' relationship developed serious problems later in the year, and by December 1991, Ms. Moore declared that she wanted a divorce. Mr. Wilson also consulted a lawyer about a divorce. An uneasy stalemate developed, and the parties began living essentially separate lives in June 1992 when Ms. Moore enrolled at Chattanooga State Technical Community College to study radiological technology. She spent most of the time during the week at school, and she studied most of the time when she was at home.

The parties separated in November 1993, and Mr. Wilson filed suit for divorce on November 8, 1993. Ms. Moore counterclaimed for divorce. Following a trial in May 1994, the trial court entered a final decree declaring the parties divorced and finding that their prenuptial agreement was valid. The trial court also found that Mr. Wilson's contributions to his retirement accounts during the marriage were marital property and awarded Ms. Moore one-half of these funds. The court also directed Mr. Wilson to be responsible for $1,500 in credit card debt and to provide Ms. Moore with health insurance coverage for up to thirty-six months or until she found employment.

Mr. Wilson filed a post-trial motion taking issue with the portion of the decision awarding Ms. Moore one-half of the contributions to his retirement accounts made during the marriage. The trial court altered its original decision after determining that the prenuptial agreement prevented Ms. Moore from receiving a share of Mr. Wilson's retirement contributions. This appeal followed.

## II.

### THE VALIDITY OF THE PRENUPTIAL AGREEMENT

---

[1]Mr. Wilson and his first wife had three children. Their oldest daughter was an adult when they were divorced, and Mr. Wilson and his first wife agreed to a joint custody arrangement with regard to their two minor sons. The boys lived alternately with their mother and father.

Ms. Moore disputes the validity of the prenuptial agreement on the ground that Mr. Wilson did not disclose his financial holdings with sufficient precision before she executed the agreement. We disagree. Mr. Wilson's explanation of his financial holdings was sufficient to enable Ms. Moore to make a knowledgeable decision with regard to executing the agreement.

### A.

Prenuptial agreements are favored by public policy in Tennessee. *Perkinson v. Perkinson,* 802 S.W.2d 600, 601 (Tenn. 1990); *Hoyt v. Hoyt,* 213 Tenn. 117, 125, 372 S.W.2d 300, 303 (1963); *Key v. Collins,* 145 Tenn. 106, 109, 236 S.W. 3, 4 (1921). They benefit the parties by defining their marital rights in property which tend to be among the most frequent causes of family discord. *Sanders v. Sanders,* 40 Tenn. App. 20, 30, 288 S.W.2d 473, 477 (1955). They also enhance the opportunities for middle-aged persons to re-marry by protecting their separate assets for the children of previous marriages. *Pajak v. Pajak,* 385 S.E.2d 384, 388 (W. Va. 1989).[2]

Tenn. Code Ann. § 36-3-501 (1991) requires the courts to give effect to prenuptial agreements as long as they satisfy certain requirements. To be enforceable, the agreement must "have been entered into by such spouses freely, knowledgeably and in good faith without exertion of duress or undue influence on either spouse." This record contains no evidence of duress, undue influence, or bad faith on Mr. Wilson's part. Thus, the principal focus of this aspect of the appeal is on the requirement that the spouse enter into the prenuptial agreement knowledgeably.

An engagement to marry establishes a confidential relationship between the parties. *Baker v. Baker*, 24 Tenn. App. 220, 223, 142 S.W.2d 737, 745 (1940); *see also* 1 Homer H. Clark, Jr., *The Law of Domestic Relations in the United States,* § 1.9, at 44 (2d ed. 1987); 3 Alexander Lindley & Louis I. Parley, *Lindley on*

---

[2]*See, e.g., Lightman v. Magid,* 54 Tenn. App. 701, 710, 394 S.W.2d 151, 156 (1965) (the husband and wife were seventy-one and fifty-eight years old respectively, and the husband had children from a previous marriage); *Baker v. Baker,* 24 Tenn. App. 220, 226, 142 S.W.2d 737, 741 (1940) (the husband and wife were sixty years old, and both had children from their previous marriages).

*Separation Agreements and Antenuptual Contracts,* § 90.03 (MB) (1995). Accordingly, engaged persons who plan to execute a prenuptial agreement must make "a full disclosure of the nature, extent and value" of their property in order to enable their prospective spouse to make a knowledgeable decision about entering into the agreement. *Williams v. Williams,* 868 S.W.2d 616, 619 (Tenn. Ct. App. 1992). The required disclosure may be accomplished through a formal, explicit process, such as exchanging lists of holdings, or it can be made more informally over the course of the relationship. *Kahn v. Kahn,* 756 S.W.2d 685, 695 (Tenn. 1988).

The adequacy of a particular disclosure depends upon the context in which it was made. Therefore, the lengths to which a person must go in revealing his or her financial interests can only be determined by the circumstances of each particular case. Rather than formulating precise tests, many courts have required that the disclosure be "full and fair"[3] or "fair and reasonable"[4] or some other similar formulation. All these standards, in essence, require that the disclosure be essentially fair under all the circumstances.

While some state courts have resolved the issue differently, most courts have not construed the full and fair disclosure requirement to mandate detailed disclosures such as financial statements, appraisals, balance sheets, or the like. *In re Estate of Lopata,* 641 P.2d 952, 955 (Colo. 1982); *In re Thies (Thies v. Lowe),* 903 P.2d 186, 189 (Mont. 1995); *In re Estate of Geyer*, 533 A.2d 423, 427 (Pa. 1987); *Hartz v. Hartz,* 234 A.2d 865, 871 n.4 (Md. 1967); *In re Estate of Hill,* 335 N.W.2d 750, 753 (Neb. 1983); *see also,* 2 John Tingley & Nicholas P. Svalina, *Marital Property Law,* § 28.05 (rev. 2d ed. 1995). Thus, in the absence of fraud or overreaching, the inadvertent failure to disclose an asset[5] or the unintentional

---

[3]*Williams v. Williams,* 868 S.W.2d at 619; *Hartz v. Hartz,* 234 A.2d 865, 870 (Md. 1966); *Fick v. Fick,* 851 P.2d 445, 450 (Nev. 1993); *Simeone v. Simeone,* 581 A.2d 162, 167 (Pa. 1990).

[4]This formulation of the standard is used by the twenty-one states which have adopted either the Uniform Premarital Agreement Act, § 6(a)(2)(I), 9B U.L.A. 369, 376 (1983) or the Uniform Marital Property Act, § 10(g)(2)(ii), 9A U.L.A. 103, 122 (1983).

[5]*Herget v. Herget,* 550 A.2d 382, 385 (Md. App. 1988), *rev'd on other grounds*, 573 A.2d 798 (Md. 1990); *Panossian v. Panossian,* 569 N.Y.S.2d 182, 184 (App. Div. 1991); *In re Estate of Beesley (Beesley v. Harris),* 883 P.2d 1343, 1348 (Utah 1994).

undervaluation of an asset[6] will not invalidate a prenuptial agreement as long as the disclosure that was made provides an essentially accurate understanding of the party's financial holdings. The disclosure will be deemed adequate if it imparts an accurate understanding of the nature and extent of a person's property interests. *Nanini v. Nanini,* 802 P.2d 438, 441 (Ariz. Ct. App. 1990).

## B.

Mr. Wilson's financial holdings immediately prior to his marriage to Ms. Moore consisted of (1) a 360-acre farm partially owned with his parents, (2) a furnished farm house, (3) farm equipment and vehicles, (4) approximately seventy head of livestock, (5) a boat, and (6) twelve other accounts or assets worth between $130,000 and $160,000. While he did not provide Ms. Moore with a detailed list of these assets and their value prior the execution of the prenuptial agreement, he attempted as best he could to familiarize her with his holdings.

Ms. Moore was familiar with Mr. Wilson's farm and was even privy to his negotiations in 1991 to sell a portion of the farm to Charles Green. She was also familiar with the farm house and its contents because she had visited there often while the parties were dating. Sometime after the engagement, Mr. Wilson removed each of his financial files from a filing cabinet in his bedroom, described each one of his accounts to Ms. Moore, and even gave her an estimate of the current value of the assets. Mr. Wilson unintentionally overlooked a $5,000 certificate of deposit and 250 shares of stock in First Pikeville Bank because he did not have folders for these assets. He also overvalued his Sherson Lehman account by approximately $13,000 because he mistook the maturity value of the bonds in the account for their current market value.[7]

Ms. Moore seemed generally disinterested in the information about Mr. Wilson's holdings. She asked no questions while Mr. Wilson was describing his property and never asked for additional information about these accounts. She

---

[6]*Farver v. Hilty,* No. S-91-3, 1991 WL 254224, at *3 (Ohio Ct. App. Oct. 11, 1991).

[7]Mr. Wilson testified later that the value of the zero coupon bonds at maturity was $31,000 but that their market value in 1991 prior to the marriage was $18,232.

reviewed and signed the prenuptial agreement ten days before the wedding without comment or question. The agreement, which was drafted by Ms. Moore's former lawyer at Mr. Wilson's request, specifically recited that both parties were "fully acquainted with the business and resources of the other," that both parties "understood the assets and possessions of the other," that both parties had "answered all questions the other has asked about income and assets," and that both parties "had access to any and all financial information of the other party."

Under all the circumstances of this case, Mr. Wilson made a full and fair disclosure of his financial holdings to Ms. Moore. His inadvertent omission of two assets whose value comprised ten to fifteen percent of the total value of his holdings was not material or significant enough to prevent the enforcement of the prenuptial agreement. This omission was also partially off-set by Mr. Wilson's mistaken overvaluation of one of his other assets. Accordingly, we concur with the trial court's conclusion that Mr. Wilson's disclosure of his holdings was sufficient to enable Ms. Moore to execute the prenuptial agreement knowledgeably as required by Tenn. Code Ann. § 36-3-501.

## III.

### THE DIVISION OF THE MARITAL PROPERTY

Ms. Moore also takes issue with the trial court's decision to classify the increase in value of several of Mr. Wilson's accounts during the marriage as his separate property. Since Tenn. Code Ann. § 36-4-121(a) (1991) vests trial courts with wide discretion with regard to classifying and dividing property, *Fisher v. Fisher,* 648 S.W.2d 244, 246 (Tenn. 1983), these decisions are entitled to great weight on appeal. *Edwards v. Edwards,* 501 S.W.2d 283, 288 (Tenn. Ct. App. 1973). They will be presumed to be correct unless the evidence preponderates otherwise, *Hardin v. Hardin,* 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983), or unless they are based on an error of law. *Mahaffey v. Mahaffey,* 775 S.W.2d 618, 622 (Tenn. Ct. App. 1989).

### A.

### MR. WILSON'S RETIREMENT ACCOUNTS

Mr. Wilson participated in the Tennessee Consolidated Retirement System and in the state-sponsored 403(b) deferred compensation program during the marriage. He arranged for his retirement contributions and his monthly $350 contributions to his 403(b) plan to be deducted automatically from his paycheck. From September 1991 through March 1994, Mr. Wilson contributed $4,099 to his retirement plan and approximately $11,850 in his 403(b) plan. As a result of the earnings on these investments, the combined value of both accounts increased by approximately $18,594.97[8] during the marriage.

The trial court first determined that the increase in the value of Mr. Wilson's retirement accounts during the marriage was marital property and awarded Ms. Moore one-half of the total increase. The trial court later reversed itself. We have determined that the trial court's first decision was correct. These contributions were marital property.

The prenuptial agreement contains two provisions relevant to the classification of Mr. Wilson's retirement contributions. One on hand, it states:

> The parties hereto shall retain the title to and shall manage and control the estate which they now own, or which they may inherit or receive by gift, whether it be realty, personalty or mixed, together with all increase or addition thereto, as though such party had remained single and unmarried, and entirely free and unmolested by the other party, as well as the right to encumber, sell, dispose of or give away, by will or otherwise, all of said estate so separately owned and possessed. Should the marriage between the parties be terminated by annulment or divorce . . . no claim for property distribution alimony, [or] support . . . shall be made by either of the parties hereto against the other party or the estate or inheritance or gifts of the other party.

On the other hand, it also states:

> Both parties acknowledge that they may accumulate certain other property during their marriage by virtue of their joint efforts. Such property acquired jointly shall

---

[8]The $2,646 difference between the total increase in the value of these accounts and Mr. Wilson's contributions represents the investment income of these two accounts.

> not be deemed part of the separate property of the parties discussed herein.

Thus, the parties agreed that increases in the value of their separate property would be considered separate property but that they could also accumulate marital property during the marriage.

Prenuptial agreements should be construed with reference to the statutes governing the distribution of marital property. They should also be construed using the rules of construction applicable to contracts in general. *In re Estate of Wiseman,* 889 S.W.2d 215, 217 (Tenn. Ct. App. 1994); *Gilley v. Gilley,* 778 S.W.2d 862, 863 (Tenn. Ct. App. 1989); *Sanders v. Sanders,* 40 Tenn. App. 20, 30, 288 S.W.2d 473, 477 (1955). Thus, the courts' role is to ascertain and to give effect to the contracting parties' intent. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.,* 521 S.W.2d 578, 580 (Tenn. 1975); *Winfree v. Educators Credit Union,* 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995).

Contracting parties' intent is embodied in their written agreements. *Gredig v. Tennessee Farmers Mut. Ins. Co.,* 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994). Accordingly, the courts must examine the text of the contract in the context of the entire agreement. *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.,* 690 S.W.2d 231, 237 (Tenn. 1985); *Cookeville Gynecology & Obstetrics, P.C. v. Southeastern Data Sys., Inc.,* 884 S.W.2d 458, 462 (Tenn. Ct. App. 1994). Contractual terms should be given their ordinary meaning, *Breeding v. Shackelford,* 888 S.W.2d 770, 775 (Tenn. Ct. App. 1994); *Jaffe v. Bolton,* 817 S.W.2d 19, 25 (Tenn. Ct. App. 1991), and should be construed harmoniously to give effect to all provisions and to avoid creating internal conflicts. *Rainey v. Stansell,* 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992); *Park Place Ctr. Enters., Inc. v. Park Place Mall Assocs., L.P.,* 836 S.W.2d 113, 116 (Tenn. Ct. App. 1992). Ambiguities in contract language should be construed against the party responsible for drafting the contract. *Hanover Ins. Co. v. Haney,* 221 Tenn. 148, 153-54, 425 S.W.2d 590, 592-93 (1968); *Grand Valley Lakes Property Owners Ass'n v. Cary,* 897 S.W.2d 262, 267 (Tenn. Ct. App. 1994).

Mr. Wilson asserts that the contributions to his retirement accounts during the marriage should not be subject to division as marital property because they were "increases" or "additions" to accounts he owned prior to the marriage. Ms. Moore, on the other hand, contends that these contributions were marital property because they came from salary Mr. Wilson earned during the marriage. Ms. Moore has the better argument.

The provision on which Mr. Wilson relies was intended to counteract Tenn. Code Ann. § 36-4-121(b)(1)(B) (1991) which states that increases in the value of separate property during the marriage should be treated as marital property if each party contributed substantially to the preservation and appreciation of the separate property. Its evident purpose was to make sure that all appreciation in the value of the property that each party owned prior to the marriage would remain separate property notwithstanding any "contributions" the other party might make. We do not construe the provision to enable one spouse to place property that would otherwise be marital property beyond the reach of the other spouse simply by depositing it into an account that existed prior to the marriage.

Mr. Wilson's contributions to his retirement accounts came directly from the salary he earned during the marriage. His salary was not separate property under either the prenuptial agreement or state law. It was not covered by the agreement because it was not part of Mr. Wilson's premarital estate and because he did not receive it by inheritance or gift. Likewise, it did not fit within the definition of separate property in Tenn. Code Ann. § 36-4-121(b)(2) (1991) but rather was marital property for the purposes of Tenn. Code Ann. § 36-4-121(b)(1)(A) (1991). Since Mr. Wilson's salary earned during the marriage was marital property, Mr. Wilson could not place it beyond Ms. Moore's reach simply by directing that it be deposited into his separate accounts.

We have determined that the $15,949 in contributions that Mr. Wilson made to his retirement accounts during the marriage were marital property subject to division. Since the abridged record does not enable us to determine how much of the investment income should properly be attributed to these contributions, we have determined that the $2,646 earned during the marriage should be treated as

Mr. Wilson's separate property in accordance with the prenuptial agreement. Accordingly, we have determined that Mr. Wilson should have been awarded his retirement accounts but also that he should have been ordered to pay Ms. Moore $7,974.50 in full and complete settlement for her interest in this property.

## B.
### MR. WILSON'S OTHER ACCOUNTS

Ms. Moore also insists that she was entitled to a portion of three other financial accounts. She claims that the funds in these accounts are marital property because Mr. Wilson opened the accounts during the marriage. We do not agree that the funds in these accounts are marital property solely because the accounts were opened during the marriage.

Mr. Wilson testified without contradiction that the funds for the three accounts in question came from his farming activities, either from the installment sale of a portion of the farm property, from the proceeds of the sale of cattle, or from renting portions of the farm land to others. There is no dispute that Mr. Wilson owned the farm prior to the marriage, and thus that the funds in these accounts were proceeds from this separate asset. Both the prenuptial agreement and the statute governing the distribution of marital property provide that property acquired in exchange for separate property and income from separate property remains separate property. Tenn. Code Ann. § 36-4-121(b)(2)(B), -121(b)(2)(C) (1991). Since the record contains no evidence that Mr. Wilson intended to treat these assets as marital property, we concur with the trial court's conclusion that these accounts should be classified as Mr. Wilson's separate property.

## IV.
### THE SPOUSAL SUPPORT AWARD

Both parties take issue with the trial court's decision to award Ms. Moore rehabilitative alimony by directing Mr. Wilson to provide her medical insurance for three years or until she remarried or became employed. Ms. Moore asserts that she was entitled to more spousal support; while Mr. Wilson predicably insists that

Ms. Moore was entitled to no support at all. We have determined that Ms. Moore's spousal support should be reduced.

The trial court ignored the provision in the prenuptial agreement in which both parties waived their right to request spousal support if they were divorced. Rather than relying on the prenuptial agreement,[9] Mr. Wilson asserts that Ms. Moore is not entitled to spousal support under the facts of this case using the criteria in Tenn. Code Ann. § 36-5-101(d)(1) (Supp. 1995). For her part, Ms. Moore asserts that she should have received spousal support more commensurate with the temporary support she was receiving prior to the divorce.

Trial courts exercise broad discretion in determining whether to award spousal support as well as the amount and duration of support if it is warranted. *Hawkins v. Hawkins,* 883 S.W.2d 622, 625 (Tenn. Ct. App. 1994); *Loyd v. Loyd,* 860 S.W.2d 409, 412 (Tenn. Ct. App. 1993); *Luna v. Luna,* 718 S.W.2d 673, 675 (Tenn. Ct. App. 1986). These decisions are guided by the factors in Tenn. Code Ann. § 36-5-101(d)(1) and are entitled to great weight on appeal. *Batson v. Batson,* 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). Accordingly, the appellate courts are disinclined to second-guess these decisions unless they are not supported by the evidence or are contrary to the public policies reflected in the statutes governing spousal support.

---

[9]Our courts have traditionally invalidated provisions in prenuptial agreements that affect a spouse's right to spousal support. *Kahn v. Kahn,* 756 S.W.2d at 694; *Duncan v. Duncan,* 652 S.W.2d 913, 915 (Tenn. Ct. App. 1983); *Crouch v. Crouch,* 53 Tenn. App. 594, 604, 385 S.W.2d 288, 293 (1964). Most other jurisdictions now honor agreements affecting spousal support. *See, e.g., Edwardson v. Edwardson,* 798 S.W.2d 941, 943-46 (Ky. 1990); *Frey v. Frey,* 471 A.2d 705, 710 (Md. 1984); *see also* 1 John Tingley & Nicholas B. Svalina, *Marital Property Law* §§ 25:01 - 25:05 (rev. 2d ed. 1995).

In 1989, a panel of the Western Section of this Court declined to follow the traditional rule and predicted that the Tennessee Supreme Court would uphold spousal support restrictions in otherwise valid prenuptial agreements when squarely presented with the issue. *Gross v. Gross,* C.A. No. 257, slip op. at 6 (Tenn. Ct. App. May 17, 1989) (no Tenn. R. App. P. 11 application filed). Recently, another Western Section panel declined to follow the *Gross* decision and declined to give effect to a prenuptial agreement's spousal support restriction. *Cary v. Cary,* App. No. 02-A-01-9401-CV-0003, slip op. at 9 (Tenn. Ct. App. Jan. 26, 1995), *perm. app. granted* (Tenn. May 1, 1995). The Tennessee Supreme Court's decision to review *Cary v. Cary* provides strong support for the *Gross* court's prediction of the demise of the traditional rule.

It is not necessary for us to address the question of the enforceability of the prenuptial agreement's spousal support restriction because Mr. Wilson has explicitly waived his reliance on this provision.

The current statutes governing spousal support reflect a preference for temporary rehabilitative support as opposed to long-term support. Tenn. Code Ann. § 36-5-101(d)(1) (economically disadvantaged spouses should be rehabilitated whenever possible). The facts of this case support the trial court's decision to provide Ms. Moore with some rehabilitative support, but they also militate against the length of support awarded by the trial court.

This marriage was of relatively short duration. Ms. Moore precipitated the divorce. She contributed comparatively little to the parties' finances[10] and apparently made little other non-financial contributions to the marriage. During the marriage, Mr. Wilson paid for many of Ms. Moore's non-marital expenses such as a note Ms. Moore executed before the marriage and expenses relating to a home that Ms. Moore owned with her first husband. He also paid for Ms. Moore's education expenses at Chattanooga State Technical Community College and for a portion of the expenses Ms. Moore incurred to support her children by her first marriage.

We have determined that requiring Mr. Wilson to provide Ms. Moore with medical insurance was a proper form of rehabilitative support. In light of Ms. Moore's contributions to the marriage, the financial benefits she received during the marriage, the amount of her separate property, and the funds she received in the division of the marital property, we have determined that Mr. Wilson should be required to provide Ms. Moore with medical insurance for two years from the date of the entry to the final decree or until she remarries or becomes employed.

**V.**

We affirm the portions of the judgment declaring the parties divorced and upholding the validity of their prenuptial agreement. In accordance with this opinion, we remand the case with directions to enter an order directing Mr. Wilson to pay Ms. Moore $7,974.50 for her interest in the marital estate and to reduce the duration of Mr. Wilson's spousal support obligation from three to two years. We

---

[10]During the marriage, Mr. Wilson earned $75,898, while Ms. Moore earned $1,587.

also tax the costs of this appeal in equal proportions to Hayden D. Wilson, Jr. and to Kathryn Ann Moore and her surety, for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____
HENRY F. TODD, P.J., M.S.


_____
SAMUEL L. LEWIS, JUDGE